UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AUTOMATIC SPRINKLER LOCAL 281, U.A. WELFARE FUND, and SPRINKLER FITTERS LOCAL UNION NO. 281, ) ) ) ) | |
| Plaintiffs, ) ) | Case No. 24-cv-674 |
| v. ) ) | Hon. Steven C. Seeger |
| WORLD CLASS FIRE PROTECTION LLC, and MICHAEL D. SULLIVAN, ) ) ) | |
| Defendants. ) ) | |

**MEMORANDUM OPINION AND ORDER**

World Class Fire Protection LLC is in the business of protecting buildings from fires through sprinkler systems. The company hires sprinkler fitters to get the job done. The sprinkler fitters are part of a union, the aptly named Sprinkler Fitters Local Union No. 281.

The benefit of using union labor comes at a price, and World Class Fire Protection agreed to pay it. The company entered into a handful of agreements that required the company to collect union dues, pay them to the Union, and pay contributions to a welfare fund.

Unfortunately, the company got behind on its payments. So the Union and the welfare fund sued the company and Michael Sullivan, its owner and President.

Plaintiffs moved for summary judgment. Defendants didn't respond.

For the reasons stated below, the motion for summary judgment is hereby granted in part and denied in part.

**Background**

World Class Fire Protection LLC specializes in sprinkler systems and pumps that provide protection from fires. *See Better Business Bureau, Business Profile: World Class Fire Protection*, https://www.bbb.org/us/il/orland-park/profile/fire-protection/world-class-fire-protection-0654-90014348 (last visited July 7, 2025). Rock beats scissors, and water beats fire.

That said, the docket is hazy when it comes to what, exactly, World Class Fire Protection does. Maybe it installs sprinkler systems. Maybe it maintains them, or manufactures parts. Or maybe it does something else. Whatever it does, the company makes sure that things get wet when things get hot.

Michael Sullivan is the sole manager and owner of WCFP. *See* Pls.' Statement of Facts, at ¶ 25 (Dckt. No. 41). Sullivan handles the finances, the payroll processing, and just about everything else. *Id.* at ¶ 26. He, and he alone, decides whether to pay WCFP's employees. *Id.* at ¶ 27. In short, Sullivan calls the financial shots for the company.

WCFP uses sprinkler fitters to do the boots-on-the-ground work. Sprinkler Fitters Local Union No. 281 represents the workers. *Id.* at ¶ 2.

WCFP and the Union entered into two collective bargaining agreements and a Trust Agreement. *Id.* at ¶¶ 3–8. The agreements require WCFP to collect dues and pay them to the Union. *Id.* at ¶ 11. The agreements also require WCFP to contribute to a welfare fund, namely, the Automatic Sprinkler Local 281, U.A. Welfare Fund. *Id.* at ¶ 9.

WCFP must make the payments within the first half of every month. *Id.* at ¶ 14. Late payments come at a price. The company must pay an extra ten percent in liquidated damages, plus a twelve percent interest charge. *Id.* at ¶ 15.

From January 2023 to November 2024, WCFP was late on transmitting the dues to the Union, and was late on its payments to the Welfare Fund. *Id.* at ¶¶ 16, 18.

The Union and the Welfare Fund ultimately sued WCFP and Sullivan. They bring one claim against each Defendant.

The first count is a claim against the company under the Employee Retirement Income Security Act, commonly known as ERISA. *See* Cplt., at ¶¶ 12–30 (Dckt. No. 1). The second count is a state-law claim against Sullivan under the Illinois Wage Payment Collection Act ("IWPCA"). *Id.* at ¶¶ 31–39.

Plaintiffs moved for summary judgment. *See* Pls.' Mtn. for Summ. J. (Dckt. No. 38). The response was due six months ago, but Defendants filed nothing. *See* 12/10/24 Order (Dckt. No. 34).

Since then, the company has made progress in meeting its obligations. When Plaintiffs filed their summary judgment motion, the company had not paid contributions for September to November 2024. *See* Pls.' Statement of Facts, at ¶ 16 (Dckt. No. 41); Pls.' Mem., at 8 (Dckt. No. 40). Since then, the company paid the contributions for those months. *See* Pls.' Suppl. Mem., at 4 (Dckt. No. 48). So Plaintiffs seek liquidated damages for those three months, but do not seek the payments themselves. *Id.*

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

3

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

But when the non-moving party does not respond to a motion for summary judgment, the court "depart[s] from [its] usual deference toward the non-moving party . . . and accepts all of [the movant]'s unopposed material facts as true." *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citing *Johnson v. Gudmundsson*, 35 F.3d 1104, 1108 (7th Cir. 1994)).

## Analysis

The facts are undisputed. Plaintiffs supported the facts with admissible evidence, and Defendants didn't respond. So this Court can accept the facts as true. *See* Local Rule 56.1(e)(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.").

The question, then, is whether the undisputed facts entitle Plaintiffs to judgment as a matter of law. The Court will address the ERISA claim against the company, before turning to the state-law claim against Sullivan. The Court will end by addressing the request for attorneys' fees.

**I.     ERISA**

The first claim is an ERISA claim against WCFP for liquidated damages. *See* Cplt., at ¶¶ 12–30 (Dckt. No. 1). Plaintiffs seek liquidated damages from the company for the late payments, plus interest. *Id.*

ERISA requires a district court to award liquidated damages and interest when called for by a plan. The statute provides that a district court "shall award . . . liquidated damages provided for under the plan." *See* 29 U.S.C. § 1132(g)(2)(C)(iii). And a district court "shall award . . . interest on the unpaid contributions." *See* 29 U.S.C. § 1132(g)(2)(B).

The existence of the obligation is undisputed. WCFP admitted that it was bound by the agreements with the Union. *See* Defs.' Answer to Pls.' Cplt., at ¶¶ 14–17 (Dckt. No. 15); *see also Laborers' Pension Fund v. Blackmore Sewer Const., Inc.*, 298 F.3d 600, 606 (7th Cir. 2002) (holding that signing a final agreement which has been negotiated is conclusive evidence that the employer intended to be bound).

Again, the agreements at hand require the company to pay ten percent liquidated damages for late payments, plus twelve percent interest. *See* Pls.' Statement of Facts, at ¶ 15 (Dckt. No. 41).

The amount of the liquidated damages is undisputed, too. The company failed to pay on time from January 2023 to November 2024. *Id.* at ¶¶ 16, 18; Pls.' Suppl. Mem., at 4 (Dckt. No. 48).

Plaintiffs crunched the numbers, calculated the amount owed, and supported the calculation with admissible evidence. Based on the record, WCFP owes $22,192.80 in liquidated damages, and $3,297.99 in interest. *See* Pls.' Statement of Facts, at ¶¶ 17, 19 (Dckt. No. 41). That's a grand total of $25,490.79.

The Court grants Plaintiffs' motion for summary judgment on Count I. WCFP must pay $25,490.79 in liquidated damages and interest.

## II. The Illinois Wage Payment Collection Act

The next claim is a claim against Sullivan under the Illinois Wage Payment Collection Act. *See* Cplt., at ¶¶ 31–39 (Dckt. No. 1). Plaintiffs seek statutory damages for the late payments.

The IWPCA, standing alone, doesn't have a lot of bite. It doesn't have any substantive teeth, above and beyond what the collective bargaining agreements already say.

"[T]he IWPCA provides no substantive relief beyond what the underlying employment contract requires. In other words, the IWPCA exists to hold the employer to his promise under the employment agreement[.]" *See Enger v. Chicago Carriage Cab Corp.*, 812 F.3d 565, 570 (7th Cir. 2016); *see also Singer v. Regional Transp. Auth.*, 338 F. Supp. 3d 791, 797 (N.D. Ill. 2018) (Feinerman, J.). Put more bluntly, "[t]he only thing [the IWPCA] requires is that the employer honor his contract." *See Nat'l Metalcrafters v. McNeil*, 784 F.2d 817, 824 (7th Cir. 1986).

The IWPCA does not create the underlying duty to pay. But it does add to the bill if the employer already has a duty to pay, and fails to pay on time.

The IWPCA requires an employer to pay statutory damages for late payments. Specifically, the statute entitles an employee to receive statutory damages for late payments,

equal to five percent of the amount owed. *See* 820 ILCS 115/14(a) ("Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to . . . the amount of any such underpayments and damages of 5% in the amount of such underpayments for each month following the date of payment during which such underpayments remain unpaid.").

The statute doesn't come out and say, with crystal clarity, that the "employer" has to pay the statutory damages. But it's hard to read the statute any other way. The statute entitles the "employee" to statutory damages when an "employer" has failed to pay on time. *Id.* It's hard to avoid the inference that the employer has a duty to pay the statutory damages, given that the employer is the one who failed to pay in the first place.

That inference receives support from the next subsection, which creates criminal liability for a failure to pay. The provision begins with the following phrase: "In addition to the remedies provided in subsections (a), (b), and (c) of this Section, any employer" who fails to pay is guilty of a misdemeanor. *See* 820 ILCS 115/14(a-5). The reference to the "remedies provided in subsection[] (a)" naturally suggests that the employer is on the hook for the remedies in subsection (a). *Id.*

The question, then, is whether Sullivan is an "employer" within the meaning of the statute. Sullivan needs to be an "employer" to be liable for statutory damages under the IWPCA. *See Andrews v. Kowa Printing Corp.*, 838 N.E.2d 894, 901 (Ill. 2005) (holding that certain defendants were not "employers" under the IWPCA).

Section 2 includes a broad definition of the term "employer." That word covers "any individual, partnership, association, corporation, limited liability company, business trust, employment and labor placement agencies where wage payments are made directly or indirectly

7

by the agency or business for work undertaken by employees under hire to a third party pursuant to a contract between the business or agency with the third party, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee, for which one or more persons is gainfully employed." *See* 820 ILCS 115/2.

That definition is a bit of a mouthful. And the mouthful of words isn't the easiest to digest. It wouldn't win a blue ribbon in a clarity contest at the state fair.

The definition sweeps broadly. It includes any "individual," plus all sorts of entities. It covers temp agencies, too, meaning businesses where an employee performs work for a third party. *Id.* (covering "employment and labor placement agencies where wage payments are made directly or indirectly by the agency or business for work undertaken by employees under hire to a third party pursuant to a contract between the business or agency with the third party").

By the look of things, the definition gives a list, and seems to cover eight types of employers. The first is an "individual." The second is a "partnership." And the eighth is a "person or group" who acts in the interest of an employer.

That definition doesn't shed a lot of light. It covers individuals, but when is an individual an employer?

The rest of the definition doesn't help, either, because it ends with a splash of circularity. An individual, partnership, association, and so on is an "employer" when "one or more persons is gainfully employed" by the individual or entity. *Id.* So, an employer is a person or an entity who . . . has an employee.

The neighboring definition of "wages" helps fill in the blanks. The statute applies to "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties." *Id.*

An "employer," then, is the person or entity with the obligation to pay under a contract or agreement. The employer must "owe[]" the wages. *Id.* So an individual is an "employer" when that person entered into a contract or agreement with an employee, and personally agreed to pay that person for his or her labor.

The last phrase of the definition of "employer" grabs your attention, in a bad way. It's hard to choke it down without giving it a few reads and chewing on it more than once.

The last phrase covers "any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." *Id.*

Under a generous reading, that phrase might cover anyone who acts on behalf of an employer vis-à-vis an employee. That is, maybe it means a person who does the company's bidding, and does things to promote the interests of the employer.

But that sweeping reading would encompass vast swaths of people inside companies. Employees at companies tend to have bosses – but bosses aren't the *employer*. The company is. The paychecks come from the company, not the boss.

Courts routinely interpret statutes against the backdrop of the common law. *See, e.g.*, *Comcast Corp. v . Nat'l Ass'n of Afr. Am-Owned Media*, 589 U.S. 327, 335 (2020) ("[W]e generally presume that Congress legislates against the backdrop of the common law."); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991).

Legislators know what's out there in the case law. They write legislation with traditional boundaries and understandings in mind. Maybe that's a fiction – but if it's a fiction, it has been around a long time, and at this point, it's a best-seller.

9

The same approach applies to principles of corporate law more generally. A bedrock principle of corporate law is that the company itself, not its owners, is responsible for the company's obligations. *See* 1 William A. Fletcher, Fletcher Cyclopedia of the Law of Corporations § 25 (2024); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) ("After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs.").

Courts should not lightly saddle individuals with corporate obligations. The structure of corporate law rests on the notion that the company is responsible for the company's obligations. Requiring individuals to backstop corporate obligations isn't the norm.

Imposing corporate obligations on individuals would upset the applecart, if not stand the applecart on its head. Transferring corporate obligations to individuals requires judicial caution, and some measure of certainty that that's what the statute means.

With that rule of construction in mind, a more modest reading of the IWPCA seems more sensible. The reference to an "individual" in the definition of "employer" covers a person who hires someone as *his or her* employee. It covers individuals who act in a personal capacity (not a corporate capacity) and hire someone else.

That more limited reading finds support in another section of the statute. Section 13 of the IWPCA extends the reach of the statute to certain officers and agents.

The statute provides that officers and agents fall within the reach of "employer" if they "knowingly permit" the employer to fail to pay. "In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an

10

employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." *See* 820 ILCS 115/13.

The existence of section 13 speaks volumes about the meaning of the definition of "employer." Section 13 wouldn't be necessary if the definition of "employer" already included the senior ranks of a company. *See* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) (discussing the surplusage canon).

The question, then, becomes whether Sullivan falls within the reach of section 13. That's how the Union and the benefit fund see things, too. They don't argue that Sullivan falls within the reach of the definition of "employer," full stop. *See* 820 ILCS 115/2. They contend that Sullivan is liable under section 13 because he "knowingly permit[ted]" the company to fail to pay. *See* 820 ILCS 115/13; *see also* Pls.' Mem., at 11 (Dckt. No. 40).

The deeper one goes down the statutory rabbit hole, the darker it gets. "There is not a wealth of case law applying this particular IWPCA provision." *See Zwick v. Inteliquent, Inc.*, 83 F. Supp. 3d 804, 811 (N.D. Ill. 2015). Illinois case law doesn't shed much light.

The natural meaning of the words, plus dictionary definitions, help to light the path. The word "permit" means "to consent to formally; to allow (something) to happen" or "to give opportunity for; to make (something) happen." *See Permit*, Black's Law Dictionary (12th ed. 2024).

The word "permit" suggests some measure of consent, or volition, or action or inaction to help make something happen. "Permit" means allow. A person permits something to happen if he or she allows it to happen. A person doesn't "permit" the Sun to rise.

"Courts in this District have interpreted 'knowingly permit' broadly to mean 'advise' or 'consent.'" *See Zwick*, 83 F. Supp. 3d at 812 (collecting cases). The IWPCA doesn't require the

11

individual to "have directly made the decision to have violated the IWPCA." *Id.* Instead, the individual falls within section 13 if he "was in a position to 'knowingly permit' the employer to violate the statute.'" *Id.*

The definition looms large when a company fails to pay the expenses of union labor because of financial problems. An individual cannot "knowingly permit" a violation of the IWPCA when the employer was *unable* to pay the amounts owed. *See Ashley v. IM Steel, Inc.*, 939 N.E.2d 22, 38 (Ill. App. Ct. 2010) ("We recognize that a corporation's inability to pay employees eliminates any possibility that the employer acted wilfully [sic] when failing to compensate employees, thereby negating liability under the [IWPCA]."); *Caulfield v. Packer Engineering, Inc.*, 2019 WL 2489687, at *9 (Ill. App. Ct. 2019) ("'[K]nowing permission' can only exist when it is possible for the employer to pay wages, and thus an officer cannot be personally liable under the [IWPCA] if the employer was unable to pay wages due to a lack of funds."); *Kilburg v. Exchange Cubed, LLC*, 2016 WL 4921554, at *7 (Ill. App. Ct. 2016) ("[A]n individual cannot knowingly permit a violation under the [IWPCA] where the employer in question as unable to pay compensation.").

The phrase "knowingly permit" suggests that the individual had his or her hands on the levers of power at the company. It suggests that the person had the ability to open the company's coffers, and pay the company's debts. And paying the company's debts, in turn, presumes that the company *can* pay its debts.

True, the statute doesn't come out and say that the company's ability to pay is necessary before imposing liability on an individual. But it is difficult to read the statute any other way. An individual doesn't permit a company to fail to pay if the company *can't* pay.

12

Maybe Sullivan could have made an argument that he did not knowingly permit the company to fail to pay its bills. But he didn't. He didn't respond to the motion for summary judgment, so there is nothing on his side of the evidentiary ledger.

Even so, as the non-movant, Sullivan didn't have the burden. Plaintiffs have the burden of demonstrating that they are entitled to judgment as a matter of law.

Plaintiffs did come forward with some evidence against Sullivan. They demonstrated that Sullivan "handles the finances of WCFP." *See* Pls.' Statement of Facts, at ¶ 26 (Dckt. No. 41). Sullivan was the "sole person responsible for making decision [sic] on whether to pay WCFP's employees and monies owed on their behalf, or not." *Id.* at ¶ 27.

That's a start, but it's not a finish.

Plaintiffs demonstrated that Sullivan was at the helm of the company. But they didn't demonstrate that the company had the ability to pay. Plaintiffs addressed only his responsibilities, not his abilities.

If the company couldn't pay, then Sullivan didn't knowingly permit the company to fail to pay. An individual does not knowingly permit a company to fail to do what the company *can't* do.

In the end, Plaintiffs needed to present evidence that Sullivan knowingly permitted the company to fail to pay dues and contributions. Maybe Plaintiffs could have gathered that evidence and built that case. But they didn't, so they don't get summary judgment.

## III. Attorneys' Fees

Finally, Plaintiffs seek attorneys' fees and costs.

Plaintiffs seek attorneys' fees from World Class Fire Protection under ERISA. *See* Pls.' Mem., at 9, 11 (Dckt. No. 40); Pls.' Suppl. Mem., at 5 (Dckt. No. 48). ERISA authorizes attorneys' fees. *See* 29 U.S.C. § 1131(g)(2)(D); 820 ILCS 115/14.

Plaintiffs filed an affidavit with the billables. *See generally* Aff. of Attorneys' Fees (Dckt. No. 41-8). The final tab comes to $33,949.54. *Id.* at 18.

The Court awards Plaintiffs $33,949.54 in attorneys' fees.

## Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment is hereby granted in part and denied in part. The motion is granted as to World Class Fire Protection, and is denied as to Sullivan.

Date: July 7, 2025

Steven C. Seeger
United States District Judge